Filed 1/31/22  P. v. Deanda CA3
Opinion following rehearing

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ROBERT DEANDA,<br><br>     Defendant and Appellant. | C089940<br><br>(Super. Ct. No. 16FE019416)<br><br>OPINION ON REHEARING |

Defendants John Damian and Robert Deanda both participated in the last of a series of three shootings between members of three different gangs.  Both defendants were convicted of, among other counts, assault with a semiautomatic firearm for their involvement in that shooting.

On appeal, Deanda contended the trial court erred when it: (1) admitted evidence of a prior assault conviction; and (2) instructed the jury to continue its deliberations when there was no reasonable probability it would reach a verdict. Both Deanda and Damian contended their sentences included enhancements for prior prison terms, which should be vacated based on the retroactive application of Senate Bill No. 136 (2019-2020 Reg. Sess.; hereafter Senate Bill 136). We originally concluded both defendants' prior prison term enhancements should be stricken, modified the judgment accordingly, and affirmed the judgment as modified. (*People v. Damian et al.* (Oct. 8, 2021, C089940) [nonpub. opn.].)

Deanda filed a petition for rehearing, which we granted, and argues he is entitled to resentencing based on legislative changes made by Senate Bill No. 567 (2021-2022 Reg. Sess.; hereafter Senate Bill 567) and Assembly Bill No. 124 (2021-2022 Reg. Sess.; hereafter Assembly Bill 124). The People agree defendant is entitled to a full resentencing under the new legislation. Accordingly, we will remand the matter to the trial court for a full resentencing.[1]

FACTUAL AND PROCEDURAL BACKGROUND

Because the testimony at trial was extensive, we will limit our recitation of the facts to those necessary to provide context to the issues on appeal. This case arises out of defendants' participation in the third of three shootings involving members of the Varrio Garden Norteño, Varrio Valley Hi Norteño, and Red Krew Norteño gangs. The Varrio Garden and Varrio Valley Hi subsets were closely aligned but had "beef" at the time with the Red Krew subset, of which defendants were members. The prosecution introduced a

---

[1] Damian did not join Deanda's petition for rehearing, and our order granting the petition vacated the prior decision as to Deanda only. Remittitur as to Damian's portion of the case was issued on December 13, 2021.

variety of evidence regarding defendants' gang membership, including a 2014 assault conviction of Deanda's, which involved other gang members.

In the first shooting, someone shot at three Varrio Garden/Varrio Valley Hi members and associates outside the home of B.Q., a Varrio Valley Hi member. One man was shot in the foot. No one was able to identify the shooters.

In the second shooting, which occurred later the same morning, someone shot at the home of R.C., a Red Krew member. R.C. was not home at the time, but his mother was. When R.C. came home, he showed his mother a photograph on his cell phone and asked her if the photograph was of a person who was involved in the shooting. She said it was, and he left the house. A Varrio Garden/Varrio Valley Hi member later pleaded no contest to discharging a firearm at an inhabited dwelling in connection with this incident.

The next day, the day of the third shooting, R.C. and his mother were packing up a trailer to move because the shooting had frightened her. Deanda, who went by the nickname "Choncho," also came to the house. Deanda and R.C. talked at length, and both seemed more serious than usual. While Deanda was at the house, R.C. received a call in which the caller told him they had a location for "the person who shot up your house." R.C. said "[h]e was on his way." Damian also stopped by in a green Ford Expedition, talked briefly with R.C., then left. Deanda and R.C. left together in a green Nissan Xterra. At the time, Deanda was heavyset and wore his hair loose or in a ponytail.

There were inconsistencies within the victims' testimony and, in some cases, conflicting accounts between witnesses, about the third shooting. Later that evening, two of the victims, along with J.V., a Norteño, parked a black Chevy Impala near B.Q.'s house, where the first shooting had occurred. J.V. told the others there could be problems with the Red Krew Norteños. J.V. went across the street to talk with someone at the house, while the two victims waited in the car. A green Expedition then stopped at a nearby intersection. Approximately three people got out of the Expedition and started

3

shooting towards the house.[2]  B.Q. returned fire from the house.  The two victims from the Impala denied that anyone in the Impala fired any shots.

Several witnesses described four to six individuals shooting at each other in the street.  Multiple witnesses identified one of the shooters near the Expedition as a heavyset Hispanic man with longer hair or a ponytail.  Witnesses described a man, later identified as R.C., fall when he was shot, and seeing a truck or SUV flee the scene.  R.C. was shot and killed during the shooting.  A 911 call also reported the shooters leaving the scene in an Expedition.

Nearby surveillance cameras captured a green Expedition near the crime scene shortly before and after the shooting.  Data from Damian's cell phone also indicated it was in the area at the time of the shooting.

Police arrested Damian driving a green Expedition the day after the shooting.  They found ammunition in the vehicle, and the vehicle had damage consistent with bullet strikes.  Tests for gunshot residue particles in the Expedition were consistent with a firearm being fired inside or slightly outside the vehicle, or with someone firing a firearm before touching the ceiling of the car.  Police arrested Deanda during a probation search the same day.

Both defendants were charged with three counts of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b); counts one, three, & four),[3] one count of discharging a firearm at an occupied motor vehicle (§ 246; count two), and one count of felon in possession of a firearm (§ 29800, subd. (a)(1); count five).  Damian was also charged with possession of ammunition.  (§ 30305, subd. (a)(1); count six.)  The prosecution alleged criminal street gang enhancements (§ 186.22, subd. (b)(1), (4)) as to

---

[2]  The victims testified to different numbers of shooters and their testimony was, in some cases, different than what they had previously told police.

[3]  Undesignated statutory references are to the Penal Code.

4

counts one through five, and personal use of a firearm enhancements (§ 12022.5, subds. (a), (d)) as to counts one, three, and four. Finally, the prosecution alleged Damian had served prior prison terms for a 2012 conviction of assault by force likely to cause great bodily injury (§ 245, subd. (a)(4)) and a 2014 conviction for felon in possession of a firearm (§ 29800, subd. (a)(1)), and Deanda had served a prior prison term for a 2014 conviction for assault with a deadly weapon (§ 245, subd. (a)(1)), which constituted a prior strike (§§ 667, subds. (b)-(i), 1170.12) and a prior serious felony conviction (§ 667, subd. (a)).

The jury found defendants guilty on counts one and five, guilty of the lesser included offense of shooting a firearm in a grossly negligent manner (§ 246.3) on count two, and Damian guilty on count six. The jury deadlocked on counts three and four and the court declared a mistrial as to those counts.[4] The jury found the personal use of a firearm and gang enhancements not true. The court found the prior conviction and prior prison term allegations true. The court sentenced Damian to an aggregate term of 13 years, including one year for each of the two prior prison terms. The court sentenced Deanda to an aggregate term of 25 years 8 months, and stayed punishment for the single prior prison term enhancement. As relevant here, Deanda asked the court to consider his traumatic childhood at sentencing, and his sentence included the upper term sentence for count one. Deanda was under 26 years old at the time of the offenses.

DISCUSSION

I

*Admission of Prior Conviction*

Deanda contends the trial court abused its discretion and violated his right to due process of law when it allowed the prosecution to introduce evidence of his prior assault

---

[4] B.Q. was the victim alleged for count one, and the two victims who arrived in the Chevy Impala were the victims alleged for counts three and four.

conviction as a predicate offense to prove a pattern of criminal activity and as evidence of his motive and intent. We disagree.

A. *Additional Background*

Before trial, the prosecution filed a motion in limine to admit evidence of Deanda's prior conviction. In the incident, Deanda, along with others, surrounded a victim who was a Norteño dropout, and yelled, "[t]his is RKN" and "dropout." One of the other individuals threw a glass bottle at the victim and hit him in the face. The prosecution asked to admit the conviction as evidence that Deanda "was with other RKN gang members in 2014" and also as evidence of motive and intent under Evidence Code section 1101, subdivision (b) in that perceived disrespect to the Red Krew Norteños motivated the 2014 assault as well as the current offenses. The prosecution also noted the 2014 assault was more probative than other gang evidence it planned to introduce in that the assault showed Deanda "is willing to participate with other gang members to commit violent acts against other people."

The trial court agreed with the prosecution, concluding the incident was "highly probative . . . to show that the defendant is not just a bit player. Mr. Deanda is . . . engaged and immersed in his gang if he would go so far as to attack another person for dropping out." Moreover, the violence in the 2014 assault was "fairly minimal compared to the violence" in the current offenses, and there was "no accusation that Mr. Deanda personally used a weapon in any way." Finally, the court observed the incident was probative of Deanda's motive and intent because "there is even a greater reason arguably to use violence [in the present case] because violence had been used against their gang. There had been prior shootings involved." Thus, the court allowed the evidence to "come in for motive and intent under [Evidence Code section] 1101 [subdivision (b)]."

At trial, Deanda renewed his objection to the introduction of the prior conviction and the court overruled the objection. The prosecution presented testimony from the mother of the 2014 assault victim, who testified her son had been attacked in front of her

6

apartment. She stated one of the attackers was named "Choncho," that he was a "big guy," and he "threw a lighter or something like that" at her son. One of the other attackers got a glass bottle and threw it at her son, hitting him in the eye. Immediately after her testimony, the court instructed the jury only to consider the testimony for the "limited purpose of whether or not he had the motive or intent to do the crimes which he's charged with here today and for no other purpose than that." The court promised a more detailed instruction later on, and read CALCRIM Nos. 375 and 1403, which limited the purposes for which the jury could consider uncharged offenses and gang activity, respectively, at the close of evidence.

The prosecution also introduced a variety of other evidence of Deanda's gang membership, including pictures of tattoos and police contacts with him associating with gang members. A gang expert opined that the current offenses were committed for the benefit of the Red Krew Norteños to instill fear in gang rivals.

B.      *Analysis*

Evidence Code section 1101 prohibits the admission of "evidence of a person's character" or propensity evidence "when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Section 1101, however, does not prohibit, "the admission of evidence that a person committed a crime . . . when relevant to prove some fact . . . other than his or her disposition to commit such an act." (*Id.*, subd. (b).) When evidence of a prior conviction may be admitted under subdivision (b) of section 1101, its admission must still comport with other policies limiting the admission of evidence, such as those contained in Evidence Code section 352. (*People v. Thompson* (1988) 45 Cal.3d 86, 109.)

To prove the gang-enhancement allegations, the prosecution was required to establish, among other things, that the gang's members engaged in a pattern of criminal activity. (*People v. Williams* (2009) 170 Cal.App.4th 587, 608-609; § 186.22, subds. (b)(4), (e), (f).) A " 'pattern' " is established by the commission of two or more

7

offenses enumerated in section 186.22, subdivision (e), committed on separate occasions or by two or more persons. (*People v. Williams,* at p. 609.) The prosecution was also required to prove that the defendant committed the underlying offense " 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (§ 186.22, subds. (b)(1), (4); *People v. Albillar* (2010) 51 Cal.4th 47, 64.)

Defendant does not dispute that evidence of his prior assault conviction, which is among the offenses enumerated in section 186.22, subdivision (e), was relevant and admissible under Evidence Code section 1101, subdivision (b) as "a predicate offense for purposes of the charged gang enhancement" or to "prove motive and intent for purposes of the same gang enhancement." Rather, he contends that evidence of the conviction should have been excluded under Evidence Code section 352 as unduly prejudicial.

"Without doubt, evidence a defendant committed an offense on a separate occasion is inherently prejudicial. [Citations.] But Evidence Code section 352 requires the exclusion of evidence only when its probative value is substantially outweighed by its prejudicial effect. 'Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.]" (*People v. Tran* (2011) 51 Cal.4th 1040, 1047 (*Tran*).) Our Supreme Court has "identified several factors that might serve to increase or decrease the probative value or the prejudicial effect of evidence of uncharged misconduct and thus are relevant to the weighing process required by Evidence Code section 352." (*Ibid.*) "The probative value of the evidence is enhanced if it emanates from a source independent of evidence of the charged offense because the risk that the witness's account was influenced by knowledge of the charged offense is thereby eliminated. [Citation.] On the other hand, the prejudicial effect of the evidence is increased if the uncharged acts did not result in a criminal conviction. This is because the jury might be inclined to punish the defendant for the uncharged acts regardless of whether it considers the defendant guilty of the charged offense and because the absence

8

of a conviction increases the likelihood of confusing the issues, in that the jury will have to determine whether the uncharged acts occurred.  [Citation.]  The potential for prejudice is decreased, however, when testimony describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense.  [Citation.]" (*Ibid.*)

Here, the evidence of Deanda's 2014 assault was probative in that it provided direct evidence of a predicate offense.  (*Tran*, *supra*, 51 Cal.4th at p. 1048.)  It was also, as the trial court noted, probative of Deanda's motive and intent, in that it showed Deanda was not a "bit player" in the Red Krew Norteños and had previously acted violently with other gang members in response to a perceived act of disrespect to the gang, just as the prosecution alleged he responded in the current offenses.  The conviction occurred approximately two years before Deanda's arrest on the current charges and the evidence came from an independent source that could not have been influenced by knowledge of the charged offense, enhancing its probative value.  (*Id.* at p. 1050; *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1212.)

Deanda was convicted of the assault, so there was little danger of confusing the issues by requiring the jury to determine if defendant was guilty of both the charged offense and the assault, and no risk the jury might convict defendant to prevent him from escaping punishment. (*Tran, supra*, 51 Cal.4th at p. 1047.)  The evidence concerning the prior conviction was less inflammatory than the testimony about the current offense. (*Ibid.*)  Although the victim in the assault was injured in the eye after defendant and other gang members threatened him for dropping out of the gang, the current charges alleged defendant engaged in a gun fight in a residential neighborhood in which someone was shot and killed.  The jury in the current case also heard 911 calls with descriptions of the decedent's injuries that were at least as graphic as the short description of the assault victim's bloody face.  Moreover, the jury was instructed that it could not consider the evidence of gang activity to prove Deanda was a person of bad character or that he had a

disposition to commit crime, mitigating the prejudicial effect of the evidence. (*People v. Cage* (2015) 62 Cal.4th 256, 275.)

Deanda contends there was so much evidence of his motive and intent, including "evidence that the charged shooting was committed as retaliation, the uncontested evidence that Deanda was a Red Krew Norteño gang member, and the gang expert's testimony about gang culture" that the prior conviction was cumulative and had little probative value. Instead, Deanda suggests, the court could have admitted merely the evidence of the conviction itself, rather than the underlying facts. But, as the People point out, the facts of the 2014 assault were important in that they showed Deanda retaliating in a violent way with other gang members in response to disrespect towards the gang. (*People v. Zepeda, supra*, 87 Cal.App.4th at p. 1212.) The prosecution was required to establish the required elements of the enhancements, including intent, beyond a reasonable doubt, and it had the " 'right to introduce all relevant and admissible evidence toward that end.' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 29; *People v. Salcido* (2008) 44 Cal.4th 93, 147 ["the prosecution is not required to . . . '. . . present its case in the sanitized fashion suggested by the defense' "].) The trial court did not abuse its discretion in admitting evidence of defendant's 2014 assault conviction. And, because we conclude the evidence was properly admitted under state law evidentiary rules, we also reject defendant's constitutional argument. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010 ["The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' [Citation.]"].)

II

*Instruction to Continue Deliberating*

Deanda argues the trial court prejudicially erred because it asked the jury to continue deliberating after the jury had declared a deadlock. Specifically, he contends "[n]othing said by the jurors . . . supports a reasonable probability that the jury could

10

reach an agreement," and the trial court thus "abused its discretion under section 1140 by requiring the jury to continue deliberating." We disagree.

A.     *Additional Background*

The jury began its deliberations in the afternoon on February 22. After breaking for the weekend, the jury resumed deliberations on February 25. During the week of February 25, the jury requested the readback of testimony for several witnesses, asked for clarification on the law regarding aiding and abetting, announced it was deadlocked, then shortly thereafter asked to continue deliberations and asked for the readback of more testimony.

On the following Monday, March 4, the court replaced a juror with an alternate based on the juror's childcare and business responsibilities. Shortly after beginning deliberations, the jury requested a readback of two witnesses' testimony. The next morning, March 5, the jury sent a message to the court stating they were deadlocked and were "unable to come to a unanimous decision with the exception of count 6."

The court summoned the jury and noted they had been deliberating for approximately a "day and a half." The jury foreperson explained they had taken multiple ballots on counts one through five, and the ballot numbers had changed between each ballot.

The court reminded the jury the court was available to answer legal questions, to provide readback of testimony, or to allow the attorneys to reargue issues if it would be helpful. The court asked the foreperson if "any of the things I've suggested to you that are possibilities . . . might be helpful to . . . this jury in coming to a decision on this case," and the foreperson replied, "[a]bsolutely." The court then asked the jury to continue deliberating.

Later that day, the jury submitted five legal questions about assault, aiding and abetting, and shooting a firearm at an occupied vehicle. The jury then left on recess for a juror's vacation from March 7 to March 18.

11

When the jury returned on March 19, the court answered the jury's questions, and the jury asked for a readback of testimony for eight witnesses and closing arguments. The court explained closing arguments are not evidence and could not be read back. On March 20, the jury requested a readback of testimony for four additional witnesses.

On March 21, the jury asked for a readback of one witness, then announced, "After having testimony read back, receiving clarification on the law and multiple votes for each defendant, on each count, we are a hung jury. [¶] We do not feel we will be able to reach a unanimous vote on any of the counts with the exception of count 6." Shortly after sending this message, the jury recessed for a juror's afternoon medical appointment.

On the morning of March 22, outside the presence of the jury, the court observed the jury had "been busy all week since they were back from vacation," and stated it "was not inclined to do anything further. I would have given them a firecracker instruction last time, because I felt like we had substituted in various alternates, and they had to restart. But since I went through some of that with them, they have done a lot of the things I suggested. I don't think there is much more we can do. There is a point at which it's difficult to keep sending jurors back. [¶] . . . [¶] There is a point at which you can only ask for so much, so I am not inclined to send them back out, but I am going to see what they have to say. There are certainly things that could change my mind on that issue."

The court then brought the jury in for questioning. The foreperson explained they had taken multiple ballots and that earlier in the week, the ballot numbers had been split 8-4 on count one and 7-5 on the remaining counts for Deanda. The numbers in a ballot taken on March 21 had then changed to 10-2 for counts one and two, and 9-3 on the remaining counts.

The court reminded the jurors of the various options the court had to assist in the deliberations, including answering legal questions, reading back testimony, or having the lawyers reargue points for the jury. The court then asked, "Do you think any of those

12

things would assist . . . the jury in coming to a decision?" Ten of the jurors said no, but Juror No. 4 responded, "I do," and Juror No. 5 said, "I'm on [the] fence."

The court asked Juror No. 4 "which of those three things that I suggested do you think could be of assistance," and Juror No. 4 replied, "Um, maybe more of the law." The court posed the same question to Juror No. 5, who replied, "I believe that the jurors who say that they don't think that anything would help, I believe they are firm in their stance. [¶] I just believe that we could have come to an agreement and had a verdict. Notwithstanding what their answers are, they don't believe it, so . . . ."

The court had an off-the-record chambers conference, then returned to the courtroom and stated:

"I spent some time discussing this with the lawyers in chambers, and my view is that if there is even a single juror on this jury that has a legal question, that I do have an obligation to answer that question.

"Juror No. 4 has indicated that there is a legal question that perhaps the Court could clarify, and so I am going to remind the jurors that in 3550 of the instructions, which is the concluding instruction that you have, it does indicate that communications to the Court can be by the foreperson or by any single juror.

"So if Juror No. 4 has a question, you can either go through the foreperson, or you can write out your question yourself on one of the jury questionnaire forms that the Court has provided you with, and the Court will then do its best to answer that question for you.

"So at this time I am going to send the jury back to continue deliberations. I'll await your questionnaire or question."

The jury left the courtroom and the court stated the defense attorneys "are both, I think, strenuously objecting to the Court sending the jury back out, and I will tell you that I had every intention, based on my initial interaction with the jury here, to declare a mistrial, until Juror No. 4 indicated that there is a legal question that the Court might be able to answer for her." The court explained:

13

"I think that the Court does have an obligation, when a jury is out, to answer their legal questions if it's possible to do so, and so I think I needed to send them out so that they could ask that question.

"I don't feel that it is coercive at this point to send them out once somebody is saying, I have a question I would like to ask. So that's why I did it.

"I have not given the so-called firecracker instruction at this point. I just sent them back to ask that question. Hopefully we'll get our question soon, and we can answer it."

Both defense attorneys then put their objections more fully on the record. The jury did not submit any questions, but returned later that afternoon, announcing they would be returning verdicts "on Counts 1, 2, and 5 for both defendants, and count 6 for John Damian. We are hung on counts 3 and 4 for both defendants."

B.    *Analysis*

Section 1140 provides that "the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." " 'The determination whether there is reasonable probability of agreement rests in the discretion of the trial court. [Citations.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." [Citation.]' [Citation.] The question of coercion is necessarily dependent on the facts and circumstances of each case. [Citation.]" (*People v. Sandoval* (1992) 4 Cal.4th 155, 195-196.)

In *People v. Thomas* (1991) 231 Cal.App.3d 299 (*Thomas*), the appellate court considered a similar set of circumstances. There, the jury informed the trial court it was deadlocked, and each juror said it would not be productive to continue deliberations. (*Id.* at p. 302.) The trial court asked for "a show of hands in response to the question, 'Do

you think it would be at all helpful to you if the court gave you further instructions on the law,' " and only one juror raised their hand.  (*Ibid.*)  The trial court asked the jury to continue deliberating and reminded the jurors they could ask the court for clarification on the law.  (*Ibid.*)  The jury returned to the jury room, did not ask any further questions, and reached a verdict shortly thereafter.  (*Ibid.*)

The appellate court determined there was nothing improper about the trial court's actions, noting that asking "the jury to consider whether further instruction on the law would assist them in reaching a verdict . . . was entirely within the scope of the court's discretion."  (*Thomas*, *supra*, 231 Cal.App.3d at p. 303.)  Importantly, "[t]he court made no remarks that could reasonably be interpreted as coercive, nor did it urge the jury to come to an agreement on either of the counts."  (*Ibid*.)  Thus, there was "no impropriety in the court's management of the impasse in the jury's deliberations."  (*Id.* at p. 304.)

Here, the jury had previously stated they were deadlocked, but when informed they could submit legal questions or ask for a readback of witness testimony, submitted several legal questions, and returned to deliberations.  Thus, when the jury stated it was deadlocked again, but one or two jurors indicated the possibility that additional legal instruction could be helpful, it was logical for the court to conclude the jury had unanswered legal questions that could help resolve the deadlock, even assuming such a possibility was speculative on the parts of the jurors.  (*People v. Pride* (1992) 3 Cal.4th 195, 264-266 [no abuse of discretion where three jurors were " 'unsure' " or " 'hopeful' " that continued deliberations would be helpful because "direction to continue deliberations could only have been perceived as giving jurors an opportunity to enhance their understanding of the case, rather than as pressure to reach a verdict"].)  And, as in *Thomas*, the court avoided any comments that could be construed as coercive, and merely sent the jury back to determine whether the jury as a whole or any individual juror had a legal question the court could answer.  (*Thomas*, *supra*, 231 Cal.App.3d at p. 303.)  We

15

conclude the trial court did not abuse its discretion in directing the jury to continue its deliberations.

## III

### *Prior Prison Term Enhancements*

Both defendants contend, and the People agree, that Senate Bill 136, which limits the prior offenses that qualify for a prior prison term enhancement under section 667.5, subdivision (b), applies retroactively to his case. We agree with the parties.

Signed by the Governor on October 8, 2019, and effective January 1, 2020, Senate Bill 136 amends section 667.5, subdivision (b), to eliminate the one-year prior prison term enhancement for most prior convictions. (Sen. Bill 136 (2019-2020 Reg. Sess.) § 1.) An exception, not applicable here, is made for a qualifying prior conviction on a sexually violent offense, as defined in Welfare and Institutions Code section 6600, subdivision (b).

Because Senate Bill 136 became effective before judgment becomes final, we agree with the parties that the amended law will apply to defendants retroactively. (Accord, *People v. Lopez* (2019) 42 Cal.App.5th 337, 340-342 [Senate Bill 136 applies retroactively to cases not yet final on appeal]; *People v. Jennings* (2019) 42 Cal.App.5th 664, 680-682 [same].) Accordingly, the section 667.5, subdivision (b) enhancements must be stricken.

As to Damian, we previously determined that because the trial court imposed the maximum term, we did not need to remand the matter for resentencing, and simply modified the judgment to strike his prior prison term enhancements. (*People v. Damian et al., supra*, C089940; *People v. Francis* (2017) 16 Cal.App.5th 876, 887 [remand unnecessary where court could not alter sentence to compensate for the loss of enhancements].) As to Deanda, we will similarly strike the one 1-year prior prison term enhancement, but, as explained below, will remand his case for full resentencing.

## IV

### *Legislative Changes*

On the same day we issued our original decision in this case, the Governor signed Assembly Bill 124 and Senate Bill 567. Assembly Bill 124 and Senate Bill 567, both of which became effective January 1, 2022, make changes affecting trial court sentencing discretion, including the ability to impose the upper term for a conviction. (Stats. 2021, ch. 695, § 5.3 [Assembly Bill 124]; Stats. 2021, ch. 731, § 1.3 [Senate Bill 567].) Among other things, Assembly Bill 124 sets a presumption that the trial court will impose the lower term under enumerated circumstances, such as where an offender's childhood trauma or youth were contributing factors in the offense. (Stats. 2021, ch. 695, § 5.3.) Senate Bill 567 limits the trial court's ability to impose the upper term unless certain conditions have been met. (Stats. 2021, ch. 731, § 1.3.) In his supplemental briefs, Deanda argues this matter must be remanded for resentencing so the trial court may reconsider its sentencing decisions under the rubric of the new legislation. The People agree remand is required in this instance, as do we.

Under *In re Estrada* (1965) 63 Cal.2d 740, "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.) As the parties point out, this presumption has been extended to amendments providing trial courts discretion to impose lesser punishment at sentencing and amendments reducing the possible punishment for classes of persons. (See, e.g., *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303-304 [Prop. 57, as approved by voters, Gen. Elec. (Nov. 8, 2016)]; *People v. Garcia* (2018) 28 Cal.App.5th 961, 971-972 [Senate Bill No. 1393 (2017-2018 Reg. Sess.)]; *People v. Valenzuela* (2018) 23 Cal.App.5th 83, 87-88 [Senate Bill No. 620 (2017-2018 Reg. Sess.)].) Nothing in Assembly Bill 124 or Senate Bill 567 suggests legislative intent

17

that the amendments apply prospectively only, and defendant's case is not yet final. (*People v. Vieira* (2005) 35 Cal.4th 264, 306.)

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.  [Citations.]  A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.'  [Citation.]  In such circumstances, [our Supreme Court has] held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.'  [Citations.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)  There is no clear indication what sentencing decisions the trial court would have made if it was bound by the new requirements under Assembly Bill 124 and Senate Bill 567.  Thus, we agree with the parties that remand is appropriate so the trial court may fully resentence defendant anew, incorporating the new legislative changes.  (See *People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15.)

## DISPOSITION

The judgment of conviction is affirmed.  The section 667.5, subdivision (b) prior prison term enhancement is stricken and the case is remanded to the trial court for a full

resentencing, consistent with the legislative changes made by Senate Bill 567 and Assembly Bill 124, discussed herein.

/s/
HOCH, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
KRAUSE, J.